COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Benton, Elder,
          Annunziata, Bumgardner, Frank, Humphreys, Clements,
          Agee, Felton and Kelsey
Argued at Richmond, Virginia


MERRY CHRISTINE PEASE
                                              OPINION BY
v.    Record No. 2761-00-3    JUDGE RUDOLPH BUMGARDNER, III
                                           DECEMBER 10, 2002
COMMONWEALTH OF VIRGINIA


                   UPON A REHEARING EN BANC

            FROM THE CIRCUIT COURT OF WISE COUNTY
                    J. Robert Stump, Judge

        Gerald L. Gray (Robert M. Galumbeck; Gerald
        Gray Law Firm; Dudley, Galumbeck,
        Necessary and Dennis, on brief), for
        appellant.

        John H. McLees, Senior Assistant Attorney
        General (Jerry W. Kilgore, Attorney General,
        on brief), for appellee.


     A jury convicted Merry Christine Pease of second degree

murder and use of a firearm during the murder of her husband,

Dennis Pease.  The defendant contends the trial placed her in

double jeopardy, the substitute prosecutor had a personal

interest in the outcome of the case, and the evidence was

insufficient to convict.  A panel of this Court held the

defendant was not placed twice in jeopardy nor was the

substitute prosecutor disqualified, but it held the evidence was

insufficient and reversed the convictions.  We granted a

petition for rehearing en banc and stayed the mandate of the panel decision.  Upon rehearing en banc, we affirm the trial court.

In August 1994, a jury convicted the defendant of the murder of her husband.  This Court reversed the conviction because the Commonwealth's Attorney examined a witness during her appearance before the grand jury and influenced the grand jury in returning the indictment.  Pease v. Commonwealth, 24 Va. App. 397, 400, 482 S.E.2d 851, 852 (1997).

On remand, the trial judge appointed substitute Commonwealth's attorneys, Code § 19.2-155, and a new grand jury re-indicted.  Those prosecutors moved to nolle prosequi the indictments because they received a report of the medical examiner that ruled the death a suicide.  The substitute Commonwealth's attorneys did not have the report when they re-indicted, and it was not in the files received from the first prosecutor.  The trial judge granted the motion.

Several months later, the trial judge appointed Timothy McAfee, the Commonwealth's Attorney at the first trial, substitute Commonwealth's attorney.  A grand jury indicted the defendant for the third time.  The defendant moved to dismiss the indictments because of prosecutorial misconduct at the first trial and because the substitute Commonwealth's attorney had conflicts of interest.  The trial judge denied the motions.

"It has long been settled . . . that the Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." Lockhart v. Nelson, 488 U.S. 33, 38 (1988). The defendant argues that double jeopardy bars her retrial because the prosecutor's misconduct caused reversal of the first conviction. "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." Oregon v. Kennedy, 456 U.S. 667, 676 (1982). Kennedy rejected an attempt "to broaden the test from one of intent to provoke a motion for a mistrial to a more generalized standard of 'bad faith conduct' or 'harassment' on the part of the . . . prosecutor." Id. at 674.

In this case, the Commonwealth's Attorney violated statutory criminal procedure by questioning a witness during her grand jury appearance. As the trial judge found, the misconduct was not an instance in which the "prosecutor was trying this case and got to a certain point and thought he was going to lose it." The record reflects nothing to indicate the prosecutor intended to delay the trial or to goad the defendant into asking for a mistrial. "Without the requisite intent, however, gross

prosecutorial misconduct will not satisfy the exception set forth in Kennedy." Robinson v. Commonwealth, 17 Va. App. 551, 555, 439 S.E.2d 622, 625 (1994). Accordingly, we hold the trial court correctly denied the motion to bar retrial.

The defendant argues that the substitute Commonwealth's attorney, Timothy McAfee, had a personal interest in the outcome of the second trial. She asserts that when the trial judge appointed him as substitute Commonwealth's attorney, McAfee had two ethical complaints against him pending from the first trial. She contends that he could not be impartial and the trial judge erred in not dismissing the indictment.

The Virginia State Bar was investigating two complaints arising from McAfee's conduct during the first trial: improper communication with the first grand jury, and withholding a medical examiner's report indicating the victim committed suicide. After a full hearing on the motion to dismiss for prosecutorial misconduct, the trial court noted that McAfee had been a federal prosecutor and "mixed the federal with the state grand jury situations." It found that it was just as probable as not that the medical examiner's report was a part of the documents received by McAfee from the medical examiner. It did not find McAfee withheld the report from the materials furnished the defense.

The trial court concluded that McAfee was not retaliating, had no reason to be vindictive, and demonstrated the ability to

be fair, impartial, and objective. The trial judge determined that McAfee had no "personal interest in the outcome of [the] case" and no actual bias to bar his participation as the prosecutor.

"A special prosecutor appointed by the trial judge steps into the role of public prosecutor and necessarily accepts that duty of impartiality." Adkins v. Commonwealth, 26 Va. App. 14, 19, 492 S.E.2d 833, 835 (1997). The record supports the trial court's ruling that the special Commonwealth's attorney was impartial. Accordingly, we affirm the ruling.

Dennis Pease, the defendant's husband, was killed by two gunshots fired within an inch of his chest. The Commonwealth maintains his death was murder; the defendant asserts it was suicide. It was one or the other. The Commonwealth postulated that the defendant shot her husband in the bedroom during an argument, that he walked into the living room and collapsed on the floor where the defendant shot him a second time, and that she then shot herself while in the kitchen to disguise the murder.

The defendant postulated that the victim shot the defendant, firing at her from the bedroom door down the hall toward the kitchen. The defendant escaped and ran from the trailer. When he saw that she had run to a neighbor's house, the victim shot himself with the bullet passing through his lung and into the kitchen coming to rest in the ironing board. The

victim then went into the bedroom where he began bleeding. From there he trailed blood into the living room where he shot himself a second time through the heart.

The two opposing theories derive from the physical evidence at the scene, the forensic analysis of that evidence, and the statements that the defendant made during the investigation. The defendant maintains the evidence was insufficient to exclude her theory of the evidence and to support the verdict of guilty. Dowden v. Commonwealth, 260 Va. 459, 467, 536 S.E.2d 437, 441 (2000), reiterated the precepts of appellate review of this issue:

> Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom. We should affirm the judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it . . . . Additionally, when a defendant challenges the sufficiency of the evidence, [i]f there is evidence to sustain the verdict, this Court should not overrule it and substitute its own judgment, even if its opinion might differ from that of the jury.

(Citations and internal quotations omitted).

About 4:00 p.m., November 18, 1993, the defendant appeared at her neighbor's house, and stated, "I have been shot. Help me." The neighbor, a law enforcement officer, observed a gunshot wound that completely penetrated her abdomen. He saw a powder burn on her sweatshirt and a powder burn on her right

- 6 -

hand that ran from her wrist to the first knuckle of her little finger. The defendant explained that she and her husband were arguing, and he went into the bedroom. When she knocked on the door to get him to come out, he jerked the door open, and shot her at very close range. "He just shot me and I ran." When asked, she specifically denied having touched the gun. When asked how she got the powder burn on her hand, she tried to rub it off with a washcloth.

At the neighbor's house, the defendant displayed no apprehension that her husband might pursue her. She exhibited no visible injuries other than the wound to her abdomen. The defendant stated she "did it all for Chris and Ketzie [her children from a prior marriage]," and "I'm all that Chris and Ketzie have now." As she left for the hospital, she said, "I may have heard another shot. I am not sure."

When police and sheriff's deputies went to the defendant's trailer, they found the victim sprawled across the living room floor lying in a pool of his blood, dead. In his left hand was a blood soaked rag; near the other was a pistol. Both of the victim's hands were bloody, but his palm carried no impression from the pistol grip. No blood was on the gun.

A path of blood led from the body, to the kitchen, past an overturned chair, and through the hall into the master bedroom. That bedroom was in shambles. The blinds and curtains were pulled from the window and strewn across the room. The bed

covers including a red sheet were pulled off, and feathers from a ripped open pillow covered everything. Before disturbing the scene, investigators made a video recording and took extensive photographs throughout the trailer. These were presented at trial, and the witnesses used them extensively as visual aids to describe, define, and clarify their testimony.

The pistol on the living room floor was a .357 caliber revolver that contained three expended cartridges. Investigators located two bullets during the initial investigation. One remained in the victim barely penetrating the skin of his back. A second bullet lodged in an ironing board in the laundry room behind the kitchen. It penetrated the kitchen wall on a slightly downward trajectory 45 inches above the floor and passed through a box of detergent before coming to rest.

The investigators could not find the third bullet though they searched the trailer for two days. They searched for it most extensively along a path running from the bedroom door, where the defendant said her husband had fired it, down the hallway through the kitchen. They found no bullet, hole, or other trace of it. They also found no hole that the third bullet may have caused anywhere in the structure or its furnishings. Four different officers testified affirmatively that it was not in the windowsill of the kitchen window. The bullet was not produced until about two weeks later.

Two weeks after the homicide, the chief investigator informed the defendant that the sheriff's office could not rule the death a suicide because they "have got a missing bullet, the one you was shot with and, you know, we can't find it."  A few days later the defendant called the investigator and informed him that she had located the bullet.  He returned to the defendant's trailer, and the defendant took him to the kitchen, moved the curtain at the window, and showed him a .38 caliber bullet.  The bullet was "lying . . . in the sill like it had never been moved."  Later analysis revealed a single red thread was attached to it.

Laboratory analysis of the physical evidence established that the decedent had been shot twice in the chest from a maximum distance of one inch.  The defendant had been shot from the same range.  All three shots came from the revolver recovered from the living room.  No discernible fingerprints appeared on the gun, and it gave no indication that it had been wiped clean.

The autopsy report described the wounds and the paths of the bullets through the victim's body.  Both entered his front chest.  One penetrated the right lung and exited the body.  The other penetrated the heart but did not exit.  Either wound was lethal, but the bullet through the lung most likely would not cause death for several minutes.  The bullet through the heart

caused death almost immediately.  If the bullet through the lung were the first shot, the victim would have been capable of inflicting both wounds.  The wounds to the victim "could be self inflicted or inflicted by someone else."

The Commonwealth presented extensive testimony from forensic experts that explained and interpreted the physical evidence found at the scene.  The gunshot residue analysis could not determine whether the defendant or the victim had fired the gun.  The victim had primer residue on both hands.  The defendant had primer residue on her face and right hand, and she had "particles that were indicative of primer residue on her left hand."

An expert in firearms stated the muzzle of the revolver was "at or near contact" when it discharged into the defendant.  To deposit gunpowder on a person's hand the hand would have to be less than one inch from the gun.  Touching a gun when it was not being fired would not leave a powder burn.

A blood stain and spatter analysis interpreted the blood found at the scene.  A single trail of the victim's blood began in the bedroom.  It ran down the hall, through the kitchen, and into the living room.  Nothing suggested more than one trail of blood.  The victim had stepped in his blood between the kitchen and the living room and then transferred it to the carpet as he moved into the living room.

The defendant called the medical examiner to explain that a person with a wound through the lung most likely would live for a few minutes but could survive for several hours.  The medical examiner was not able to conclude when the blood started to flow from the wound to the lung.  It was possible for someone to walk twelve to fifteen feet after being shot without dripping any blood on the floor.  It was also possible to walk that distance, pull blinds and curtains off the bedroom wall, walk another twenty feet into the living room, and inflict a second gunshot wound.

The Commonwealth presented evidence of the defendant's statements and remarks made over the course of the investigation.  The subsequent explanations varied from those made initially to her neighbor.  At the hospital while she was still in the emergency room, the defendant stated she walked away from the bedroom door into the kitchen.  She was standing near a chair beside the kitchen table when the husband opened the bedroom door and shot her.  He was from five to eight feet from her when he shot.  He then came towards her and brandished the pistol.  She struck it with her right hand and begged him not to kill her.  She jerked away and ran to neighbors.

The next morning, the defendant said she and her husband were arguing about money.  He went to her car and did something to it.  He returned and locked himself in the master bedroom.  She went to the door and demanded to know what he had done to

her car.  He opened the door, shot her, but then caught her in the kitchen.  She hit his gun hand without touching the gun and ran out the front door.  She thought she heard another shot as she ran off the porch.  About two weeks later, the defendant said the argument was over her not spending more time with him, and they had discussed getting a divorce.  That time, she denied hearing any shots after she left the house.

Two other incidents suggested that the defendant was present after the victim was shot and that she lacked remorse.  She was present during interrogation of the deputy chief medical examiner.  When asked whether the victim would have been in pain after the first shot, the defendant interjected, "a lot."  Another time during the investigation, witnesses described her as laughing and giggling as she viewed the photographs of her dead husband on the floor of the trailer.

From the evidence presented, the jury must determine credibility and the weight of that which it finds as true.  "'The weight which should be given to evidence and whether the testimony of a witness is credible are questions which the fact finder must decide.'"  Cantrell v. Commonwealth, 7 Va. App. 269, 290, 373 S.E.2d 328, 339 (1988) (quoting Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986)).

After determining credibility and assessing the weight of the testimony, the jury must ascertain what reasonable inferences arise from the facts they found proven by that

testimony. "'[W]hat inferences are to be drawn from proved facts is within the province of the jury . . . .'" Id. (quoting Higginbotham v. Commonwealth, 216 Va. 349, 353, 218 S.E.2d 534, 537 (1975)). If alternative inferences are possible, the jury resolves the differences and determines which inferences are reasonably drawn. "[T]he jury must use its experience with people and events in weighing the probabilities." Holland v. United States, 348 U.S. 121, 140 (1954). The trier of fact has the responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Finally, the jury decides if the proven facts, and the reasonable inferences drawn from them, establish guilt beyond a reasonable doubt. If so, the jury, as instructed, convicts. If the jury decides that a theory of innocence remains and the theory is reasonable, it, as instructed, acquits. "Whether an alternative hypothesis of innocence is reasonable is a question of fact . . . ." Archer v. Commonwealth, 26 Va. App. 1, 12, 492 S.E.2d 826, 832 (1997).

On appeal, we review the jury's decision to see if reasonable jurors could have made the choices that the jury did make. We let the decision stand unless we conclude no rational juror could have reached that decision. "[I]f there is evidence to sustain the verdict, this Court should not overrule it and

- 13 -

substitute its own judgment, even if its opinion might differ from that of the jury."  Dowden, 260 Va. at 467, 536 S.E.2d at 441 (citations and internal quotations omitted).

Three shots were fired and inflicted three distinct wounds: two to the victim, one to the defendant.  The person who fired the shot through the victim's lung fired the shot through his heart.  Both sides agree to that inference.  The person who fired those two shots could have been the victim or the defendant.

The shot through the victim's heart was fired in the living room where the bullet remained lodged in him.  Both sides agree to that inference.  The place where the other two bullets were discharged is not so easily fixed.  Tangible damage does not record the path of the bullet found in the windowsill, and the Commonwealth and the defense do not agree about it.  However, they do agree that the same bullet could not have hit both the victim and the defendant.

The path of the bullet into the ironing board was exactly opposite to the path of a bullet found in the windowsill:  the former going from right to left when facing the trailer and the latter going from left to right.  The location of the bullet in the windowsill was approximately in the same plane as that formed by the wall between the kitchen and the laundry room.  If the ironing-board-bullet struck the defendant, the victim did

- 14 -

not fire a shot from the bedroom door, down the hall, and into her as she claimed.

Before the jury scrutinized the evidence, theoretically either bullet could have hit either person.  The ironing-board-bullet or the windowsill-bullet could have hit the victim or the defendant.  But, once the believable evidence links one of the two bullets to one of the two persons shot, the other bullet must be linked to the other person shot.  Defining whom the ironing-board-bullet struck defines whom the windowsill-bullet struck.  If the bullet in the ironing board passed through the victim's lung, then the bullet in the windowsill hit the defendant.  If the ironing-board-bullet passed through the defendant, then the windowsill-bullet penetrated the victim's lung.  The possible explanations were mutually exclusive.

Defining which bullet struck which person defines whether the homicide is murder or suicide.  The victim committed suicide if the ironing-board-bullet hit him or if the windowsill-bullet hit the defendant.  Conversely, the defendant committed murder if the ironing-board-bullet hit her or if the windowsill-bullet hit the victim.  When evidence establishes the truth or falsity of any one of the alternatives, it resolves the truth or falsity of all possibilities.  In doing so, it resolves the guilt or innocence of the defendant beyond a reasonable doubt.

The jury resolved the issue of whether a bullet passed from the bedroom door, through the defendant, and landed in the windowsill. The verdict reflects the jury's decision to disbelieve the defendant's story. Four witnesses stated unequivocally that the sill contained no bullet the night of the shootings. The bullet suspiciously appeared after the investigator told the defendant he would not rule the death a suicide without it. Other evidence contributed to make the defendant's story unlikely. According to the defendant, the bullet traveled a maximum distance of six to eight feet and landed at nearly a right angle to the initial axis of flight. It landed in the corner of the windowsill closest to the point of discharge, but it was so spent it dropped onto the sill without breaking the window, marking the sill, or tearing the curtains that covered the window.

In deciding to disbelieve the defendant's claim she found the bullet, the jury would have considered and evaluated her other statements and conduct. From her first statement to her neighbor, she gave stories incompatible with irrefutable physical facts. She claimed she had never touched the gun, but she had a large powder burn on her hand, which she tried to wash off. The defendant maintained she was six to eight feet from the gun when shot, but the residue on her sweatshirt established the gun was within one inch of her when it discharged. She

claimed she left the trailer before the victim was shot, but she made remarks that indicated otherwise.

The jury was entitled to evaluate the reasonableness of the defendant's story. "Moreover, the jury was not required to believe the defendant's explanation, and if that explanation is not believed, the jury may infer that the accused is lying to conceal his guilt." Black v. Commonwealth, 222 Va. 838, 842, 284 S.E.2d 608, 610 (1981). The jurors did not believe the bullet landed in the windowsill where the defendant said she found it. If that basic fact was not true, it was not reasonable to infer the ultimate fact that the shot was fired from the bedroom door, through the defendant, and onto the windowsill. Having found the defendant lied, reasonable jurors could infer that she found the bullet elsewhere in the trailer and planted it in the windowsill hoping to bolster her story that she was shot by the victim. Such decisions were neither arbitrary nor capricious, but the very essence of trial by jury.

The physical evidence permits a reasonable conclusion that the defendant shot herself and was not shot by the victim. The ironing-board-bullet penetrated the wall 45 inches from the floor, the exact height of the entrance wound to the defendant. The jury used its experience with people and events in weighing the probabilities of the defendant's story: that the victim decided to shoot the defendant during their argument; that he found the defendant's gun, hidden where she did not expect him

- 17 -

to find it; and that he used it rather than his own pistol, which was loaded and readily available. The jury also assessed the probability that the victim, after shooting the defendant once, let her flee from his grasp without firing a second time.

The jury determined it was not reasonable to believe the victim first shot himself in the lung, then walked to the bedroom without bleeding where he tore the room apart, and then walked back to the living room before shooting himself the second time. The victim dripped blood from the bedroom, to the kitchen, to the living room. The trail began next to the dresser under which the defendant had hidden her gun. It inexorably records his path of weakening capacity and diminishing consciousness from the bedroom into the living room where the fatal shot penetrated his heart. The jury assessed the demonstration of the way the victim had to hold the gun to inflict the first wound. The victim was right-handed. The shot entered near the nipple passing from right of center up and outward. The victim had emergency medical training and knew where his heart was. The lung shot would have required a conscious contortion to avoid the heart.

The jury also assessed whether it was reasonable to believe the victim could walk dripping the trail of blood shown in the exhibits without getting blood on his right hand. The gun had no blood or fingerprints on it, and the victim's right palm had no imprint from the pistol grip. An investigator testified he

expected to find blood on the victim's hand because of the way he had dripped blood. The jury assessed whether that was reasonable in light of specific testimony the victim's palm contained blood distinctive from the type coughed from his mouth and nose as he lay dying.

The jurors assessed whether it was reasonable to infer that the defendant was present when the victim was shot. The defendant fled from the trailer but was not afraid the victim pursued her. The defendant made statements that indicated she knew he was dead. She knew the victim was in pain from the lung shot. A blood-spatter expert found no indication that a smear of blood on the victim's back could have been made by him. One strand of the defendant's hair was trapped in the blood coughed up by the victim as he lay on the floor dying. The defendant was able to find the third bullet when no one else could.

The defendant argues in her brief that if an item of evidence is susceptible of two interpretations, the jury cannot rely on it to convict unless the Commonwealth shows the defendant's interpretation is impossible. That is, if another explanation is possible, the Commonwealth must exclude the possibility. It is a review of the facts we rejected in Cantrell.

The defendant's argument misapplies the requirement that the Commonwealth must exclude every reasonable hypothesis of innocence. The defendant applies the maxim to each individual

- 19 -

item of evidence. If the defense offers a possible explanation for the item, the Commonwealth fails to exclude every reasonable hypothesis of innocence unless it shows the defendant's possible explanation is impossible. "We place too great a burden on the Commonwealth if we require it to exclude every possible theory or surmise presented by the defense." Black, 222 Va. at 841, 284 S.E.2d at 609.

For example, the defendant argues no inference can be drawn against her from the fact she had a large powder burn on her hand. The defendant maintained that shooting herself could not have made the particular shape of burn she received. She argued the evidence indicated that she could have received that burn by placing her hand just above the entrance wound as the gun fired into her. The Commonwealth maintained it was made by holding the gun while shooting herself. Both sides punctuated the testimony supporting their interpretations of this item of evidence with demonstrations. The jury had those demonstrations in mind while assessing whether the defendant's interpretation was reasonable under all the related facts and circumstances. On appeal we grant the inference favorable to the Commonwealth if it is reasonable. The record on appeal does not provide those demonstrations that give integral definition of the spoken word. However, the record does not require that we find it unreasonable to reject the defendant's theory and accept the Commonwealth's theory. Accordingly, an adverse inference could

be drawn from the powder burn and the powder burn was a circumstance the jury could consider when deciding guilt.

The statement that circumstantial evidence must exclude every reasonable hypothesis of guilt is an alternative way of stating the fundamental precept that the Commonwealth has the burden to prove each element of an offense beyond a reasonable doubt. It reiterates "the standard applicable to every criminal case." Cook v. Commonwealth, 226 Va. 427, 433, 309 S.E.2d 325, 329 (1983); see Holland, 348 U.S. at 140. Circumstantial evidence is not viewed in isolation. "'While no single piece of evidence may be, sufficient, the "combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion."'" Derr v. Commonwealth, 242 Va. 413, 425, 410 S.E.2d 662, 669 (1991) (quoting Stamper v. Commonwealth, 220 Va. 260, 273, 257 S.E.2d 808, 818 (1979) (quoting Karnes v. Commonwealth, 125 Va. 758, 764, 99 S.E. 562, 564 (1919))).

Whether the defendant's explanation is a "'reasonable hypothesis of innocence' is a question of fact." Cantrell, 7 Va. App. at 290, 373 S.E.2d at 339. A jury does not have to accept a fact if they find the basis for it is improbable. It can be improbable because it is based on testimony the jury does not believe; or it is not reasonable to draw an inference based on their collective experience of people and events. "[I]t is within the province of the jury to determine what inferences are

to be drawn from proved facts, provided the inferences are reasonably related to those facts."  Inge v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567-68 (1976).

Much of the evidence in this case was undisputed.  The two sides offered opposing interpretations.  A jury resolves such conflict.  Indeed, twice juries accepted the interpretation of evidence argued by the Commonwealth.[1]  "When, as here, conflicting inferences flow from the undisputed evidence, principles of appellate procedure require us to adopt those conclusions most favorable to the Commonwealth if fairly deducible from the proven facts."  Pugh v. Commonwealth, 223 Va. 663, 667, 292 S.E.2d 339, 341 (1982).

When the facts are viewed in the light most favorable to the Commonwealth and all reasonable inferences consistent with guilt are granted to it, no reasonable theories of innocence remain.  The combined force of the many concurrent and related circumstances proved beyond a reasonable doubt that the ironing-board-bullet passed through the defendant.  Thus, the victim could not have shot her, and he did not kill himself.  As this jury reasonably viewed the evidence, only the defendant could have killed him.  Accordingly, we affirm.

Affirmed.

---

[1] This Court did not grant an appeal on the issue of the sufficiency of the evidence on the first appeal.

Benton, J., with whom Elder, J., joins, concurring, in part, and dissenting, in part.

I concur with the majority opinion on the issues of double jeopardy and prosecutorial misconduct.  I dissent, however, from the majority's conclusion that the evidence was sufficient to sustain the convictions.

## I.

At trial, the evidence proved that on the morning of November 18, 1993, a friend of Merry Pease's husband approached him at work because he thought Pease's husband was angry with him.  He testified that Pease's husband was acting differently than normal and "just wasn't his self."  Pease's husband said he thought Pease was having an extra-marital affair, and he said "something was going to happen real soon."  The co-worker told Pease's husband that when he thought his own wife was having an affair, he had removed the ignition coil from her car so that she could not leave home.  Pease's husband left work at the end of his shift at 8:00 a.m.

Later that afternoon, Pease loudly knocked at the door of a neighbor, who was a police officer, and said, "I have been shot. Help me."  The neighbor called the emergency number and then attended to a wound near Pease's abdomen, where a "bullet had penetrated all the way through her."  He saw a powder burn on her clothing and on her hand.  In response to the neighbor's questions, Pease said her husband shot her and she had not

- 23 -

touched the gun. Although he later wrote that Pease was shot "point blank," the neighbor testified that this was only his interpretation of what she said. He testified that Pease told him the following events occurred:

> She said that they had been arguing and having some problems. That she had went to the back door, or the back bedroom to the door and was knocking on the door trying to get Dennis to come out. And she said that he jerked the door open and pointed the gun at her and shot her. And she turned around and ran out of the residence.

The neighbor testified that Pease said "as [she] went out of the house, [she] may have heard another shot." Pease also told him that her husband had disabled her car and that she first went to the road to get help but no one stopped.

Pease was transported to a hospital where she received medical treatment for a life-threatening wound to her abdomen. Several investigators questioned Pease after she arrived at the hospital. Investigator Darnell testified Pease said that she and her husband had argued for "a couple of weeks," that her husband had taken her checkbook, and that, on this day, she had been unable to start her car. Pease also said she was five to eight feet from her husband, near a kitchen chair, when he shot her.

Investigator Robinson testified that they did not record their interview with Pease. He recalled she said the following in the interview:

[S]he had gone to the bedroom door of the master bedroom and asked . . . what he had done to her car.

She turned and walked away from the bedroom into the kitchen or the bedroom door into the kitchen. The bedroom door opened and she turned and [he] fired a pistol striking her in the abdomen.

He came towards her. He brandished the pistol. She said she struck the pistol with her right hand and asked him, said please don't kill me, she jerked away from him and ran out the mobile home and ran seeking assistance at the next door neighbors'.

The police discovered Pease's husband dead in the living room of the home with two gunshot wounds, one to his right lung and a second wound to his heart. He was not wearing shoes or a shirt. A woman's underpants, drenched in his blood, was near his left hand. Feathers were on and near his body. In his pocket, the police found a wire from a car's distributor cap and a wire that had been removed from the home's telephone. A Ruger .357 revolver, which was the weapon that fired the bullets, was on the floor near his body; it had three empty chambers. The Commonwealth offered as evidence the autopsy report, which described the two gunshot wounds. The report also contains the notation: "If [the] wound [to the lung] was the first shot, [Pease's husband] would have been capable of inflicting both wounds." Pease's husband's blood had an alcohol content of .10.

The record contains extensive testimony concerning the condition and configuration of the mobile home residence. When

the police entered the home, the primary bedroom was in disarray. The blinds from the bedroom window were on the floor and demolished. Feathers from a burst pillow were strewn about. The bedroom door, which could be locked from inside, was only six feet from the kitchen table. A kitchen chair was overturned in the hallway between the two rooms. Pease's husband's shoes were in one of the children's bedrooms, along with his cigarettes and an alcoholic drink. A desk had been overturned in that room.

The investigators found a bullet lodged in an ironing board near the kitchen. Another bullet, which caused the wound to Pease's husband's heart, was found lodged in his back. The investigators searched that night for the third bullet but were unable to locate it. They also found no hole that the third bullet may have caused in the structure or its furnishings.

The next morning, the investigators again visited Pease in the hospital. One investigator said when they questioned Pease, she said she was in a lot of pain but wanted to talk. During this interview, Pease recounted the following:

> [T]hey had been arguing for about two weeks about money and the kids, that that day they were arguing about money and she made a comment that he wouldn't give her enough money to run the household, that they had been arguing that morning about money.

> *   *   *   *   *   *   *

> She indicated she had went to the bedroom door to begin with because her husband,

Dennis, had went to her car and done
something to her car and came back into the
trailer into the master bedroom, locked the
door.

She went to the door and asked him what
have you done to my damn car and he opened
the door and shot her.

*  *  *  *  *  *  *

She gave Investigator Mullins an
explanation that [her husband] had caught up
with her, she was headed toward the living
room but he had caught her in the kitchen
and she had hit his hand that had the gun in
it but that she never touched the gun.

*  *  *  *  *  *  *

When she pushed his hand that had the gun
in it away in the kitchen, she ran out the
front entrance of the trailer and she
thought she heard another shot as she was
running off the porch, the front porch of
the trailer.

About two weeks later, Investigator Mullins visited Pease

at her home.  He testified that he told her the police could not

rule this case a suicide because they "have got a missing

bullet, the one you was [sic] shot with and, you know, we can't

find it."  When he asked if her husband abused her in the past,

Pease said that she and her husband had argued about her

spending more time with him, that she had told her husband she

had to spend several days each week with her father, and that

they had discussed getting a divorce.  She said her husband had

never accused her of being unfaithful, but he was extremely

obsessive and possessive.  Pease also told the investigators

- 27 -

that her husband was strict with her children, that he was verbally abusive toward her, but that she had never obtained warrants against her husband for abuse. When asked if she had heard any shots after she left the house, she said she had not.

Investigator Mullins testified that Pease called a few days later to inform him she had located the bullet. When he returned to Pease's home, Pease moved the curtain on the kitchen window and exposed a .38 caliber bullet. Investigator Mullins testified that the bullet was "lying . . . in the [window]sill like it had never been moved." He also testified that the bullets were "wad cutters" that had previously been reloaded. He explained that the charges in the bullets were not as powerful as commercially purchased bullets and that, when shot from the gun, the bullet would not travel as fast as a regular, manufactured bullet.

The Commonwealth produced extensive evidence from police investigators and forensic experts. The investigators found no blood and no discernible fingerprints on the gun. They also found no indication that the gun had been wiped clean. An expert in gunshot residue testified that his analysis did not allow him to conclude whether Pease or her husband fired the weapon. He testified that Pease's husband had primer residue on both hands and that Pease had primer residue on her face and right hand and "particles that were indicative of primer residue on her left hand." The gunshot residue on hands could indicate

the person fired a weapon or was in close proximity to the discharge of a weapon or handled a dirty weapon.  He also testified "it would not be unusual at all for . . . primer residue to be found on [an] individual at a [distance] of six feet" and he would expect to find primer residue if an individual had a hand around the barrel of a revolver or around the cylinder.

An expert in the field of firearms and toolmarks testified that, based on his examination of Pease's sweatshirt, the muzzle of the revolver was "at or near contact" with Pease when it was discharged at her.  He testified that a hand could have a gunpowder burn even without coming in contact with the gun "[i]f the heel portion of the hand was directly above the muzzle, then it would pick up the residue as opposed to the extending fingers or down the elbow."  The firearms expert testified that in order for gunpowder to deposit on a person's hand the person's hand would have to be less than one inch away from the gun and that he would not anticipate a burn on the heel of a person's hands would be caused by simply touching the gun when it was not firing.

A blood stain and spatter expert testified that the shots to Pease's husband would not necessarily cause blood to spray from the wound.  She also testified that there was "one blood trail with connecting blood drops that connect from the bedroom area through that hall, through the kitchen and into the living

room."  There was no indication that there had been multiple paths.  The expert testified further that the blood on the floor between the kitchen and the living room had been disturbed "which indicates that . . . something had come into contact with that to move or to alter the blood that was in that pre-existing stain pattern."  She testified that if someone's heel had disturbed the blood drop, that the foot would create a "diminishing repetitive transfer . . . every time it stepped."  She also testified that there was evidence of such transfers on the floor and that a stain on the heel of Pease's husband's foot indicated he was responsible for the transfer.

Testifying as Pease's witness, the assistant chief medical examiner gave the only testimony about the autopsy report.  He testified that if he had to choose, it is more likely that the shot to the heart was immediately incapacitating as opposed to the shot to the lung.  He opined that a person with a bullet wound to the lung, such as found in Pease's husband, could live "at least a few minutes, probably several minutes . . . [a]nd in some cases, perhaps, . . . several hours."  He testified that such a person "would have had enough strength and presence of mind to do a great many things including" walking twelve to fifteen feet and pulling blinds and curtains off the wall.  He also testified that such a person could walk twelve to fifteen feet after being shot without dropping any blood on the floor and that it was not possible to conclude when the blood started

to flow because that would depend on a number of factors including the position of that person's body. He further testified that it was possible that a person with this type of wound to a lung could have walked another twenty feet, the distance from the bedroom to the living room, and inflicted the second wound. He testified that "in the absence of any extraneous information, you could say this could be self inflicted or inflicted by someone else." He also testified that Pease's husband had a .10% blood alcohol content which would have affected his judgment.

At the conclusion of the evidence, the jury convicted Pease of second degree murder and use of a firearm in the commission of murder.

## II.

"It is essential in every prosecution for the commission of a homicide that the Commonwealth prove the corpus delicti." Lane v. Commonwealth, 219 Va. 509, 514, 248 S.E.2d 781, 783 (1978). "To establish the corpus delicti in a homicide, the Commonwealth must prove the victim's death resulted from the criminal act or agency of another person." Betancourt v. Commonwealth, 26 Va. App. 363, 373, 494 S.E.2d 873, 878 (1998). As a matter of constitutional law, the Due Process Clause protects an accused from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime

with which [she] is charged."  In re Winship, 397 U.S. 358, 364 (1970).

No one saw Pease shoot her husband; thus, the Commonwealth relied upon circumstantial evidence to support the conviction. When a conviction is based entirely upon circumstantial evidence, we are guided by the following standards in our review:

> [W]ell established principles apply to testing the sufficiency of circumstantial evidence.  [The Supreme Court has] summarized those principles as follows:
>
> ". . . [I]f the proof relied upon by the Commonwealth is wholly circumstantial, as it here is, then to establish guilt beyond a reasonable doubt all necessary circumstances proved must be consistent with guilt and inconsistent with innocence.  They must overcome the presumption of innocence and exclude all reasonable conclusions inconsistent with that of guilt.  To accomplish that, the chain of necessary circumstances must be unbroken and the evidence as a whole must satisfy the guarded judgment that both the corpus delicti and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty. . . ."
>
> But, circumstances of suspicion, no matter how grave or strong, are not proof of guilt sufficient to support a verdict of guilty.  The actual commission of the crime by the accused must be shown by evidence beyond a reasonable doubt to sustain his conviction.

Clodfelter v. Commonwealth, 218 Va. 619, 623, 238 S.E.2d 820, 822 (1977) (citations omitted).

The majority reasons that because the evidence provides a reasonable basis from which the jury could conclude Pease killed her husband, this Court must defer to the jury's decision. This reasoning, however, disregards the prosecutor's obligation to exclude every reasonable hypothesis of innocence whenever, as here, a conviction is based solely on circumstantial evidence. The law is clear:

> Proof by circumstantial evidence "is not sufficient . . . if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture." Littlejohn v. Commonwealth, 24 Va. App. 401, 414, 482 S.E.2d 853, 859 (1997) (citing Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 74, 78 (1977)). "'[A]ll necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.'" Stover v. Commonwealth, 222 Va. 618, 623, 283 S.E.2d 194, 196 (1981) (quoting Inge v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567 (1976)). "When, from the circumstantial evidence, 'it is just as likely, if not more likely,' that a 'reasonable hypothesis of innocence' explains the accused's conduct, the evidence cannot be said to rise to the level of proof beyond a reasonable doubt." Littlejohn, 24 Va. App. at 414, 482 S.E.2d at 859 (quoting Haywood v. Commonwealth, 20 Va. App. 562, 567-68, 458 S.E.2d 606, 609 (1995)). The Commonwealth need not "exclude every possible theory or surmise," but it must exclude those hypotheses "which flow from the evidence itself." Cantrell v. Commonwealth, 7 Va. App. 269, 289-90, 373 S.E.2d 328, 338-39 (1988) (citations omitted).

Betancourt, 26 Va. App. at 373-74, 494 S.E.2d at 878.

A jury's verdict founded merely upon a reasonable belief that Pease killed her husband is not a sufficient basis to meet the standard of proof beyond a reasonable doubt.  Such a verdict simply means there is some evidence consistent with her guilt.  See Sullivan v. Louisiana, 508 U.S. 275, 278 (1993) (noting that the constitutional standard of proof beyond a reasonable doubt is not satisfied by "hav[ing] a jury determine that the defendant is probably guilty").  The Supreme Court has "emphasized that proof beyond a reasonable doubt has traditionally been regarded as the decisive difference between criminal culpability and civil liability."  Jackson v. Virginia, 443 U.S. 307, 315 (1979).  These principles also are articulated decisions as follows:

> It is well settled in Virginia that to justify conviction of a crime, it is not sufficient to create a suspicion or probability of guilt, but the evidence must establish the guilt of an accused beyond a reasonable doubt.  It must exclude every reasonable hypothesis except that of guilt. The guilt of a party is not to be inferred because the facts are consistent with his guilt, but they must be inconsistent with his innocence.

Cameron v. Commonwealth, 211 Va. 108, 110-11, 175 S.E.2d 275, 276 (1970) (citations omitted) (emphasis added).  In short, as here, where "inferences are relied upon to establish guilt, they must point to guilt so clearly that any other conclusion would be inconsistent therewith."  Dotson v. Commonwealth, 171 Va. 514, 518, 199 S.E. 471, 473 (1938).

Several investigators and Pease's neighbor testified from their notes about statements Pease made to them at various times. None of Pease's statements were recorded, and Pease gave no written account of the events. In each rendition of Pease's statements, however, Pease denied shooting her husband and said her husband shot her. Noting that Pease made several statements concerning the events and her conduct that ensued, the Commonwealth argues in its brief, that the jury could reasonably find that Pease contradicted herself on various things including (i) whether a struggle occurred in the kitchen, (ii) her distance from her husband when he shot her, (iii) whether she heard a shot as she ran from the home, (iv) whether she found the bullet on the windowsill, and (v) how she received the burn on her hand. None of the conflicts, however, excludes Pease's story that her husband committed suicide.

Although the jury is entitled to believe that Pease made contradictory statements, Pease's statements concerning what transpired must be viewed in the context in which they were made. The Supreme Court has held that "[t]he probative value of [a defendant's] inconsistent statements must be determined in light of the situation in which they were made." Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 78, 78 (1977). Pease's conflicting statements unquestionably were made at a time when Pease was in severe pain from the gunshot wound. Furthermore, most of the conflicts in the statements concerned

matters that are not material concerning the identity of the shooter.

The evidence proved the events occurred inside a mobile home, where the distances are not great. Although the evidence proved the bedroom was in disarray, no evidence established that Pease caused it or was in the bedroom when it occurred. The evidence is consistent with her statements that her husband locked himself in the bedroom after he removed a wire from the car's distributor cap. The evidence further proved that Pease's husband had been drinking alcohol and that the room where his drink was located was also in disarray. Moreover, the evidence proved that the distance from the door of the bedroom to the kitchen table was only six feet. Each of Pease's statements places her between the bedroom door and the kitchen when she was shot. The Commonwealth's firearms expert testified that the muzzle of the firearm was "at or near contact" with her when it was fired. The expert's testimony is not inconsistent with Pease's statements that she did not fire the gun. This evidence is also consistent with Pease's defense that her husband shot her in this area at close range.

The Commonwealth and the majority opinion make much of the fact that Pease found the third bullet and suggest that the jury could find that she placed it there. The evidence is undisputed, however, that three bullets were discharged from the gun. Although the investigators searched the residence, they

did not find it.  Tellingly, one investigator testified, when asked whether he was looking for the bullet or the bullet hole, "[w]ell of course, we were looking for the bullet hole.  You have got to find the hole before you can find the bullet." Indeed, it is likely the officers failed to find the bullet because they were looking for a bullet hole.

The evidence proved that the bullet had been reloaded and did not have the usual charge.  The bullet was a "homemade reload" with a "low load."  Thus, a forensic expert testified that such a bullet, having an altered, reduced charge which passed through a body, could have struck the structure without penetrating it and fallen to the windowsill.  The forensic evidence, therefore, does not negate the conclusion that the bullet landed in the windowsill.  Indeed, the forensic expert testified that if the gun was shot from the bedroom area door at someone in the hallway, the bullet could possibly go to the kitchen window area.  Depending on trajectory, velocity, and the angle of the bullet, the bullet could have landed on the windowsill.

In addition, no evidence explained the red fiber the Commonwealth contends was on the bullet.  The Commonwealth did not ask the examiners to compare it with any other fibers. Moreover, the forensic expert testified that he did not know, of his own knowledge, that the fiber came from the bullet.  The evidence proved, however, that the officer who collected the

bullet from the windowsill put it in a bag that "came from [his] lunch" and, thus, may have exposed the bullet to extraneous substances.

Moreover, the evidence does not conclusively establish that the bullet found lodged in the ironing board was the bullet that penetrated Pease. The firearms expert testified that the bullet that went into the ironing board was on a downward trajectory. The evidence established that in order for this to be the bullet that went through Pease's abdomen Pease would have had to be against the wall when the shot was fired. Given the downward trajectory of the bullet, it could also have been the bullet that entered Pease's husband's lung. Therefore, this evidence is consistent with the forensic evidence that the bullet retrieved from the windowsill was the bullet that wounded Pease. In view of the forensic evidence, the investigators' testimony that they thoroughly searched the house for the third bullet reasonably establishes that they obviously overlooked the bullet in the windowsill.

The Commonwealth also argues that the evidence is inconsistent with Pease's assertion that she was not present when her husband was wounded. The Commonwealth points to a strand of Pease's hair found in the puddle of blood from her husband's mouth and to a foreign DNA substance found on Pease's shoe as evidence that Pease was present when her husband was shot. Although the evidence established that one blond hair

that had been forcibly removed from Pease's head was in a puddle of blood near her husband's mouth, an expert in hair and natural fiber examination testified that it was possible the hair could have been removed in combing.  Only one strand of hair was found.  The expert testified it was unlikely that only one strand of hair could have been forceably pulled from a person's head by another person.  The expert also testified that this hair could have been transported from the husband's clothes.  Furthermore, Pease's hair would likely be found at any place in her own residence.

A forensic expert in DNA testing testified that DNA material, consisting of blood and some other material, was found on Pease's left shoe.  He explained that "the major profile [of the DNA found in the blood] was consistent with . . . Pease."  There were also regions of DNA with genetic material inconsistent with Pease's DNA.  The DNA material in these regions could have been indicative of a small amount of blood or saliva, sweat, or some other bodily fluid.  Although the expert could not rule out Pease's husband as a possible contributor, the DNA was also found in one out of seven people of the Caucasian population in that region.  More importantly, the expert could not identify when the DNA material was deposited.  Therefore, neither piece of evidence establishes that Pease was present when her husband was wounded.  This evidence was merely indicative of the fact she lived in the residence.

The Commonwealth argues that the jury could reject Pease's hypothesis that her husband shot her and then shot himself. It argues that her husband had told his co-worker that he believed Pease was having an extra-marital affair, that Pease was unsympathetic after her husband's death, and that Pease had a financial motive to kill her husband.

Although the record contains extensive testimony about forensics, the evidence fails to disprove the hypothesis that Pease's husband was the shooter. A large amount of testimony centered on where the shots were fired and whether the location of the bullets matched Pease's account of what had transpired. The assistant chief medical examiner testified that it was certainly possible for Pease's husband to inflict both wounds to himself. He testified that after the first lung shot, a person could live "at least a few minutes, probably several minutes . . . [a]nd in some cases, perhaps, . . . several hours." He testified that Pease's husband "would have had enough strength and presence of mind to do a great many things including" walking into the bedroom and pulling blinds and curtains off the wall. Moreover, he also testified that Pease's husband's intake of alcohol would have affected his judgment.

He further opined that it was also possible that Pease's husband could have walked from the bedroom to the living room, which is immediately adjacent to the kitchen area, and inflicted the second wound. Although he did not know whether it happened,

he testified that it was possible for a person to walk twelve to fifteen feet after being shot without dropping any blood on the floor.  According to the assistant chief medical examiner, it was just as reasonable as not to believe that Pease's husband walked down the hallway without depositing blood, pulled the blinds from the window, and shot himself in the heart.

The Commonwealth argues that because there was blood on Pease's husband's hands, he could not have handled the gun to fire the second shot to his heart which an expert explained would have been immediately incapacitating.  A blood stain and spatter expert explained, however, that the shots to Pease's husband would not necessarily cause blood to spray from the wound.  The experts also testified that the blood on Pease's husband's hands could have come from coughing blood from his nose and mouth.  Although there was evidence that Pease's husband could have been carrying, in one hand against his wound, the woman's underpants that were found by his body, no evidence ruled out the reasonable possibility that Pease's husband had blood on the hand carrying the woman's underpants and no blood on the other hand carrying the gun.

The evidence revealed that no blood from the heart shot had flowed down toward Pease's husband's jeans but a small amount of the blood had flowed across his back as he lay on the floor.  Contrary to the blood spatter expert's opinion that there was no indication Pease's husband had been upright when the shot to his

heart was fired, the assistant chief medical examiner testified that Pease's husband could have been standing but the blood began flowing after he was on his side. He also opined that Pease's husband could have been standing when the shot to his lung was fired and that it was not necessary for him to have been against any surface for the bullet to have remained lodged in his back. In short, the evidence did not negate the hypothesis that Pease's husband fired the second shot and that he committed suicide.

Although the Commonwealth argues that the jury could infer that Pease had a motive to kill from the husband's belief that Pease was having an affair, no evidence in this record establishes the truth of the husband's supposition. The testimony by the co-worker of Pease's husband gives an indication, however, of the husband's beliefs and his state of mind. Indeed, the testimony reveals that several hours before the shooting the husband was "not [him]self," appeared to the co-worker to be angry, and expressed the view that "something was going to happen real soon." The evidence further proved the husband drank enough alcohol to affect his judgment after he left work that morning. He also disabled Pease's car, as his friend suggested, and disabled the telephone in the home. This evidence tends to prove that Pease's husband had a motive to initiate what transpired in the Pease home on November 18, 1993.

Investigator Parker testified that Pease was present when investigators interviewed the deputy chief medical examiner regarding the incident. When the investigators asked the medical examiner whether Pease's husband had been in pain after the first shot, Pease said "a lot." Another investigator testified that he was present when Pease viewed the pictures of her house and her deceased husband. He said Pease laughed when she saw the pictures, and another witness stated that Pease "was giggling and laughing and pointing at them and making notes on a paper." Although these were matters the jury could consider, they indicated only inappropriate reactions after the fact and are not inconsistent with the conclusion that her husband shot her.

The Commonwealth also notes that Pease's neighbor testified that while Pease was in his home waiting for the emergency response team, he overheard part of the conversation she was having with his wife. He testified that Pease was telling his wife about "some problems she had been having." After discussing the need to have someone get her children, Pease then "leaned back in the chair" and said "I either done or did it all for [my children]." Although the Commonwealth argues that the jury could have concluded that Pease's statement was incriminating, Pease's neighbor's testimony clearly indicates that he heard only part of the conversation. The evidence fails to reveal the entire context in which Pease's statement was

made.  Pease's comment could reasonably relate to the discussion she was having with her neighbor's wife about her marital problems.  Indeed, Pease later told the investigators she and her husband had argued for weeks about their children and her husband's failure to provide "enough money to run the household."  Thus, this evidence is also not inconsistent with the hypothesis that her husband shot her.  Where the facts are "equally susceptible of two interpretations, one of which is consistent with the innocence of the accused, the jury cannot arbitrarily adopt the interpretation which incriminates [the accused]."  Massie v. Commonwealth, 140 Va. 557, 564, 125 S.E. 146, 148 (1924).

A witness from the Social Security Administration testified that as a result of Pease's husband's death Pease would receive $718 a month until her youngest daughter was age 16 and her two children would received $718 a month until they were age 18.  No evidence proved, however, that Pease knew that she would receive this amount of social security benefits as a result of her husband's death.  Without additional speculation, this evidence does not aid the Commonwealth's theory that Pease wanted to kill her husband to advance her personal financial gain.

Viewed in the light most favorable to the Commonwealth, the evidence does not exclude the reasonable hypothesis that Pease's husband shot her and himself.  The forensic evidence does not exclude that reasonable hypothesis.  The close contact nature of

- 44 -

the shots is consistent with that hypothesis. "[T]he doctrine [is long-standing] that where the evidence leaves it indefinite which of several hypotheses is true, or establishes only some finite probability in favor of one hypothesis, such evidence cannot amount to proof, however great the probability may be." Massie, 140 Va. at 565, 125 S.E. at 148 (citing Johnson's Case, 70 Va. (29 Gratt.) 796, 817 (1878)). In view of the significant, substantial evidence of suicide, the jury could not have inferred beyond a reasonable doubt from the evidence that Pease killed her husband. As in this case, convictions cannot be based on "speculation and surmise." Lane, 219 Va. at 515, 248 S.E.2d at 784. Because the Commonwealth failed to exclude Pease's hypothesis of innocence, and all circumstantial evidence is not consistent with guilt, I would hold the evidence was insufficient to prove Pease's guilt beyond a reasonable doubt.

                                          Tuesday        7th

          May, 2002.


Merry Christine Pease,                                    Appellant,

 against      Record No. 2761-00-3
              Circuit Court No. F98-319

Commonwealth of Virginia,                                Appellee.


                Upon a Petition for Rehearing En Banc
                       Before the Full Court


          On April 16, 2002 came the appellee, by the Attorney

General of Virginia, and filed a petition praying that the Court

set aside the judgment rendered herein on the 2nd day of April,

2002, and grant a rehearing en banc thereof.

          On consideration whereof, the petition for rehearing en

banc is granted, the mandate entered herein on 2nd day of April,

2002 is stayed pending the decision of the Court en banc, and the

appeal is reinstated on the docket of this Court.

          The parties shall file briefs in compliance with Rule

5A:35. The appellee shall attach as an addendum to the opening

brief upon rehearing en banc a copy of the opinion previously

rendered by the Court in this matter. It is further ordered that

the

appellee shall file with the clerk of this Court twelve additional copies of the appendix previously filed in this case.

                        A Copy,

                   Teste:
                             Cynthia L. McCoy, Clerk

                   By:

                        Deputy Clerk

COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Bumgardner
Argued at Salem, Virginia


MERRY CHRISTINE PEASE

                                MEMORANDUM OPINION[*] BY
v.    Record No. 2761-00-3     JUDGE JAMES W. BENTON, JR.
                                    APRIL 2, 2002
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF WISE COUNTY
                    J. Robert Stump, Judge

        Robert M. Galumbeck (Gerald L. Gray; Dudley,
        Galumbeck, Necessary and Dennis, on brief),
        for appellant.

        (Randolph A. Beales, Attorney General;
        John H. McLees, Jr., Senior Assistant
        Attorney General, on brief), for appellee.


     A jury convicted Merry Christine Pease of second degree

murder of her husband, Dennis Pease, and using a firearm in the

commission of that murder.  On appeal, Pease contends the trial

judge erred by failing to dismiss the indictment on double

jeopardy grounds, refusing to disqualify the substitute

prosecutor, and denying her motion to set aside the verdict based

on insufficiency of the evidence.  We hold the evidence was

insufficient to prove the offenses, and we reverse the

convictions.

---

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

I.

A jury first convicted Pease in August of 1994 for the murder of her husband and the use of a firearm in the commission of murder.  A panel of this Court reversed those convictions because the Commonwealth's Attorney, Timothy McAfee, improperly influenced the grand jury when he "informed them that he thought [a witness for Pease] would not be truthful . . . [and] actually examined [the same] witness for the grand jury."  Pease v. Commonwealth, 24 Va. App. 397, 400, 482 S.E.2d 851, 852 (1997).  We held that this behavior violated Code § 19.2-201 and "that . . . McAfee substantially influenced the grand jury in reaching an indictment to the prejudice of [Pease]."  Id. at 400, 482 S.E.2d at 852.

On remand, the trial judge appointed two attorneys as substitutes for the Commonwealth's Attorney.  See Code § 19.2-155.  A grand jury re-indicted Pease on the same charges.  Later, the substitute prosecutors filed a motion to nolle prosequi the indictments.  They asserted that

> exculpatory evidence which ha[d] recently
> come into the hands of the [substitute]
> prosecutors . . . , namely a Report of the
> Medical Examiner which rules the death of
> Dennis Pease as suicide[,] . . . was not in
> the files received by [the substitute]
> prosecutors when they chose to refile the
> charges . . . [and] was . . . [not] admitted
> into evidence in the previous trial.

The trial judge granted the motion.

Several months later, upon the motion of the newly elected Commonwealth's Attorney, the trial judge appointed McAfee, the former Commonwealth's Attorney, to serve as substitute prosecutor pursuant to Code § 19.2-155.  A grand jury again issued an

indictment against Pease for the murder of her husband and the use of a firearm in the murder.  In response, Pease filed motions to quash the indictment, alleging double jeopardy, conflict of interest by McAfee, and other grounds.  The trial judge denied the motions.

At trial, the evidence proved that on the morning of November 18, 1993, a friend of Pease's husband approached him at work because he thought Pease's husband was angry with him.  He testified that Pease's husband was acting differently than normal and "just wasn't his self."  When he spoke to Pease's husband, Pease's husband said he thought Pease was having an extra-marital affair.  Pease's husband also said "something was going to happen real soon."  The co-worker told Pease's husband that when he thought his own wife was having an affair, he had removed the ignition coil from her car so that she could not leave home. Pease's husband left work at the end of his shift at 8:00 a.m.

Later that afternoon, Pease loudly knocked at the door of a neighbor, who was a police officer, and said, "I have been shot. Help me."  The neighbor called the emergency number and then attended to a wound near Pease's abdomen, where a "bullet had penetrated all the way through her."  He saw a powder burn on her clothing and on her hand.  In response to the neighbor's questions, Pease said her husband shot her and she had not touched the gun.  Although he later wrote that Pease was shot "point blank," the neighbor testified that this was only his interpretation of what she said.  He testified that Pease told him the following events occurred:

> She said that they had been arguing and

having some problems.  That she had went to the back door, or the back bedroom to the door and was knocking on the door trying to get Dennis to come out.  And she said that he jerked the door open and pointed the gun at her and shot her.  And she turned around and ran out of the residence.

The neighbor testified that Pease said "as [she] went out of the house, [she] may have heard another shot."  Pease also told him that her husband had disabled her car and that she first went to the road to get help but no one stopped.

Pease was transported to a hospital where she received medical treatment for a life-threatening wound to her abdomen. Several investigators questioned Pease after she arrived at the hospital.  Investigator Darnell testified Pease said that she and her husband had argued for "a couple of weeks," that her husband had taken her checkbook, and that, on this day, she had been unable to start her car.  Pease also said she was five to eight feet from her husband, near a kitchen chair, when he shot her.

Investigator Robinson testified that they did not record their interview with Pease.  He recalled she said the following in the interview:

> [S]he had gone to the bedroom door of the master bedroom and asked . . . what he had done to her car.
>
> She turned and walked away from the bedroom into the kitchen or the bedroom door into the kitchen.  The bedroom door opened and she turned and [he] fired a pistol striking her in the abdomen.
>
> He came towards her.  He brandished the pistol.  She said she struck the pistol with her right hand and asked him, said please don't kill me, she jerked away from him and ran out the mobile home and ran seeking

- 51 -

assistance at the next door neighbors'.

The police discovered Pease's husband dead in the living room of the home with two gunshot wounds, one to his right lung and a second wound to his heart.  He was not wearing shoes or a shirt.  A woman's underpants, drenched in his blood, was near his left hand.  Feathers were on and near his body.  In his pocket, the police found a wire from a car's distributor cap and a wire that had been removed from the home's telephone.  A Ruger .357 revolver, which was the weapon that fired the bullets, was on the floor near his body; it had three empty chambers.  The Commonwealth offered as evidence the autopsy report, which described the two gunshot wounds.  The report also contains the notation:  "If [the] wound [to the lung] was the first shot,

[Pease's husband] would have been capable of inflicting both wounds."

The record contains extensive testimony concerning the condition and configuration of the mobile home residence. When the police entered the home, the primary bedroom was in disarray. The blinds from the bedroom window were on the floor and demolished. Feathers from a burst pillow were strewn about. The bedroom door, which could be locked from inside, was only six feet from the kitchen table. A kitchen chair was overturned in the hallway between the two rooms. Pease's husband's shoes were in one of the children's bedrooms, along with his cigarettes and an alcoholic drink. A desk had been overturned in that room.

The investigators found a bullet lodged in an ironing board near the kitchen. Another bullet, which caused the wound to Pease's husband's heart, was found lodged in his back. The investigators searched that night for the third bullet but were unable to locate it. They also found no hole that the third bullet may have caused in the structure or its furnishings.

The next morning, the investigators again visited Pease in the hospital. One investigator said when they questioned Pease, she said she was in a lot of pain but wanted to talk. During this interview, Pease recounted the following:

> [T]hey had been arguing for about two weeks about money and the kids, that that day they were arguing about money and she made a comment that he wouldn't give her enough money to run the household, that they had been arguing that morning about money.

>      *    *    *    *    *    *    *

> She indicated she had went to the bedroom

door to begin with because her husband,
Dennis, had went to her car and done
something to her car and came back into the
trailer into the master bedroom, locked the
door.

  She went to the door and asked him what
have you done to my damn car and he opened
the door and shot her.

  \*       \*       \*       \*       \*       \*       \*

  She gave Investigator Mullins an
explanation that [her husband] had caught up
with her, she was headed toward the living
room but he had caught her in the kitchen
and she had hit his hand that had the gun in
it but that she never touched the gun.

  \*       \*       \*       \*       \*       \*       \*

  When she pushed his hand that had the gun
in it away in the kitchen, she ran out the
front entrance of the trailer and she
thought she heard another shot as she was
running off the porch, the front porch of
the trailer.

About two weeks later, Investigator Mullins visited Pease at
her home.  He testified that he told her the police could not
rule this case a suicide because they "have got a missing bullet,
the one you was shot with and, you know, we can't find it."  When
he asked if her husband abused her in the past, Pease said that
she and her husband had argued about her spending more time with
him, that she had told her husband she had to spend several days
each week with her father, and that they had discussed getting a
divorce.  She said her husband had never accused her of being
unfaithful, but he was extremely obsessive and possessive.  Pease
also told the investigators that her husband was strict with her
children, that he was verbally abusive toward her, but that she
had never obtained warrants against her husband for abuse.  When

- 54 -

asked if she had heard any shots after she left the house, she said she had not.

Investigator Mullins testified that Pease called a few days later to inform him she had located the bullet. When he returned to Pease's home, Pease moved the curtain on the kitchen window and exposed a .38 caliber bullet. Investigator Mullins testified that the bullet was "lying . . . in the [window]sill like it had never been moved." He also testified that the bullets were "wad cutters" that had previously been reloaded. He explained that the charges in the bullets were not as powerful as commercially purchased bullets and that, when shot from the gun, the bullet would not travel as fast as a regular, manufactured bullet.

The Commonwealth produced extensive evidence from police investigators and forensic experts. The investigators found no blood and no discernible fingerprints on the gun. They also found no indication that the gun had been wiped clean. An expert in gunshot residue testified that his analysis did not allow him to conclude whether Pease or her husband fired the weapon. He testified that Pease's husband had primer residue on both hands and that Pease had primer residue on her face and right hand and "particles that were indicative of primer residue on her left hand." The gunshot residue on hands could indicate the person fired a weapon or was in close proximity to the discharge of a weapon or handled a dirty weapon. He also testified "it would not be unusual at all for . . . primer residue to be found on [an] individual at a [distance] of six feet" and he would expect to find primer residue if an individual had a hand around the barrel of a revolver or around the cylinder.

An expert in the field of firearms and toolmarks testified that, based on his examination of Pease's sweatshirt, the muzzle of the revolver was "at or near contact" with Pease when it was discharged at her.  He testified that a hand could have a gunpowder burn even without coming in contact with the gun "[i]f the heel portion of the hand was directly above the muzzle, then it would pick up the residue as opposed to the extending fingers or down the elbow."  The firearm expert testified that in order for gunpowder to deposit on a person's hand the person's hand would have to be less than one inch away from the gun and that he would not anticipate a burn on the heel of a person's hands would be caused by simply touching the gun when it was not firing.

A blood stain and spatter expert testified that the shots to Pease's husband would not necessarily cause blood to spray from the wound.  She also testified that there was "one blood trail with connecting blood drops that connect from the bedroom area through that hall, through the kitchen and into the living room." There was no indication that there had been multiple paths.  The expert testified further that the blood on the floor between the kitchen and the living room had been disturbed "which indicates that . . . something had come into contact with that to move or to alter the blood that was in that pre-existing stain pattern." She testified that if someone's heel had disturbed the blood drop, that the foot would create a "diminishing repetitive transfer . . . every time it stepped."  She also testified that there was evidence of such transfers on the floor and that a stain on the heel of Pease's husband's foot indicated he was responsible for the transfer.

Testifying as Pease's witness, the assistant chief medical examiner gave the only testimony about the autopsy report.  He testified that if he had to choose, it is more likely that the shot to the heart was immediately incapacitating as opposed to the shot to the lung.  He opined that a person with a bullet wound to the lung, such as found in Pease's husband, could live "at least a few minutes, probably several minutes . . . [a]nd in some cases, perhaps, . . . several hours."  He testified that such a person "would have had enough strength and presence of mind to do a great many things including" walking twelve to fifteen feet and pulling blinds and curtains off the wall.  He also testified that such a person could walk twelve to fifteen

feet after being shot without dropping any blood on the floor and that it was not possible to conclude when the blood started to flow because that would depend on a number of factors including the position of that person's body.  He further testified that it was possible that a person with this type of wound to a lung could have walked another twenty feet, the distance from the bedroom to the living room, and inflicted the second wound.  He testified that "in the absence of any extraneous information, you could say this could be self inflicted or inflicted by someone else."  He also testified that Pease's husband had a .10 percent blood alcohol content which would have affected his judgment.

At the conclusion of the evidence, the jury convicted Pease of second degree murder and use of a firearm in the commission of murder.

II.

Pease contends the evidence proved that the prosecutor's misconduct, which influenced the grand jury to return the initial indictment and which gave rise to the reversal of her conviction, bars her retrial under the Double Jeopardy Clause of the Fifth Amendment.  We disagree.

The following principles are now well recognized:

> The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense. As a part of this protection against multiple prosecutions, the Double Jeopardy Clause affords a criminal defendant a "valued right to have his trial completed by a particular tribunal." The Double Jeopardy Clause, however, does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding.

Oregon v. Kennedy, 456 U.S. 667, 671-72 (1982) (footnote and citations omitted).

> Underlying this constitutional safeguard is the belief that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

United States v. Dinitz, 424 U.S. 600, 606 (1976) (citation omitted). The Supreme Court has noted, however, that "[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." Kennedy, 456 U.S. at 675-76. Consequently, the Court specifically "h[e]ld that circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a

- 59 -

mistrial."  Id. at 679.

Noting that the prosecutor violated the statute when he obtained the first indictment against Pease, the trial judge found that this was not an instance in which the "prosecutor was trying this case and got to a certain point and thought he was going to lose it."  The record supports the trial judge's finding that the prosecutor's misconduct, which we addressed on the first appeal of this case, was not done in an attempt to goad Pease into seeking a new trial.  The misconduct occurred at the initial grand jury stage of the proceeding before an indictment was issued.

In Kennedy, the Supreme Court rejected an attempt "to broaden the test from one of intent to provoke a motion for a mistrial to a more generalized standard of 'bad faith conduct' or 'harassment' on the part of the . . . prosecutor."  456 U.S. at 674.  The Supreme Court could not have been clearer when it ruled that "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." Id. at 676.  Pease points to no evidence that the prosecutor intended, at the time he sought the indictment, to delay the trial or to goad Pease into asking for a mistrial of the trial, which then had not been scheduled.  Accordingly, we hold that the record supports the trial judge's denial of Pease's motion to bar retrial.

III.

Relying on Adkins v. Commonwealth, 26 Va. App. 14, 492

- 60 -

S.E.2d 833 (1997), Pease argues that McAfee, who obtained the first invalid indictment and who tried the case on remand as a substitute prosecutor, had a personal interest in the outcome of the proceeding.  Pease asserts that McAfee was not impartial and had two ethical complaints pending against him when the judge appointed him as substitute prosecutor.  She contends the trial judge erred in not removing him from the case and quashing the second indictment he obtained from the grand jury.

"A special prosecutor appointed by the trial judge steps into the role of public prosecutor and necessarily accepts that duty of impartiality."  Id. at 19, 492 S.E.2d at 835.

> It is true that prosecutors may on occasion
> be overzealous and become overly committed
> to obtaining a conviction.  That problem,
> however, is personal, not structural . . .
> [and] such overzealousness "does not have
> its roots in a conflict of interest."

Young v. U.S. Ex Rel. Vuitton Et Fils S.A., 481 U.S. 787, 807 n.18 (1987) (citation omitted).

Testimony at the evidentiary hearing established that the complaints against McAfee concerned his conduct of the trial that led to Pease's first conviction, which we later reversed.  The Virginia State Bar was investigating complaints concerning an allegation of improper communication with the first grand jury and an allegation that McAfee had withheld from Pease's defense attorney a report by Dr. David W. Oxley, the deputy chief medical examiner, which indicated Pease's husband's death "was probably a suicide."

Concerning whether McAfee provided the defense with    Dr. Oxley's report, the judge found that "[i]t's just as probable

that [the cover sheet] was not . . . attached as it was attached" to the documents delivered to Pease's attorney.  As to the other complaint, the judge noted that McAfee had been a prosecutor in the federal system, where prosecutors routinely enter the grand jury room, and he declined to find that McAfee's communication to the grand jury was intentional.  He found that McAfee "mixed the federal with the state grand jury situations."  He further found as follows:

> It is my opinion that Mr. McAfee will not be retaliating against Ms. Pease.  She is not going to testify against him in any Bar complaint.  [There is no] reason for Mr. McAfee to be vindictive against her. . . . I find [there] is certainly evidence of his ability to be impartial and fair and objective.

In summary, based on the evidence presented at the hearing, the trial judge determined that McAfee had no "personal interest in the outcome of [the] case" and that McAfee "had no reason to vindicate himself."  Further, the trial judge found that McAfee had no actual bias that barred his participation as the prosecutor.  In view of the evidence and the trial judge's findings, we cannot say the trial judge erred in ruling that the evidence was insufficient to support Pease's assertion of impropriety by McAfee.

IV.

"It is essential in every prosecution for the commission of a homicide that the Commonwealth prove the corpus delicti."  Lane v. Commonwealth, 219 Va. 509, 514, 248 S.E.2d 781, 783 (1978).  "To establish the corpus delicti in a homicide, the Commonwealth must prove the victim's death resulted from the criminal act or

agency of another person."  Betancourt v. Commonwealth, 26 Va.

App. 363, 373, 494 S.E.2d 873, 878 (1998).  No one saw Pease

shoot her husband; thus, the Commonwealth relied upon

circumstantial evidence to support the conviction.  When a

conviction is based entirely upon circumstantial evidence, we are

guided by the following standards in our review:

> [W]ell established principles apply to
> testing the sufficiency of circumstantial
> evidence.  [The Supreme Court has]
> summarized those principles as follows:
>
> ". . . [I]f the proof relied upon by the
> Commonwealth is wholly circumstantial, as it
> here is, then to establish guilt beyond a
> reasonable doubt all necessary circumstances
> proved must be consistent with guilt and
> inconsistent with innocence.  They must
> overcome the presumption of innocence and
> exclude all reasonable conclusions
> inconsistent with that of guilt.  To
> accomplish that, the chain of necessary
> circumstances must be unbroken and the
> evidence as a whole must satisfy the guarded
> judgment that both the corpus delicti and
> the criminal agency of the accused have been
> proved to the exclusion of any other
> rational hypothesis and to a moral
> certainty. . . ."
>
> But, circumstances of suspicion, no
> matter how grave or strong, are not proof of
> guilt sufficient to support a verdict of
> guilty.  The actual commission of the crime
> by the accused must be shown by evidence
> beyond a reasonable doubt to sustain his
> conviction.

Clodfelter v. Commonwealth, 218 Va. 619, 623, 238 S.E.2d 820, 822

(1977) (citations omitted).  Pease argues that her husband did

not die through the criminal agency of another; she contends the

evidence failed to exclude the reasonable conclusion that he

committed suicide.

- 63 -

Several investigators and Pease's neighbor testified about statements Pease made to them at various times. In each instance, they testified from notes they made. None of Pease's statements were recorded, and Pease gave no written account of the events. In each rendition of Pease's statements, Pease denied shooting her husband and said her husband shot her. Noting that Pease made several statements concerning the events and her conduct that ensued, the Commonwealth argues, however, that the jury could reasonably find that Pease contradicted herself on various things including (i) whether a struggle occurred in the kitchen, (ii) her distance from her husband when he shot her, (iii) whether she heard a shot as she ran from the home, (iv) whether she found the bullet on the windowsill, and (v) how she received the burn on her hand.

Although the jury is entitled to believe that Pease made contradictory statements, Pease's statements concerning what transpired must be viewed in the context in which they were made. The Supreme Court has held that "[t]he probative value of [a defendant's] inconsistent statements must be determined in light of the situation in which they were made." Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 78, 78 (1977). Pease's conflicting statements unquestionably were made at a time when Pease was in severe pain from the gunshot wound. Furthermore, most of the conflicts in the statements concerned matters that are not material concerning the identity of the shooter.

The evidence proved the events occurred inside a mobile home, where the distances are not great. Although the evidence proved the bedroom was in disarray, no evidence established that

Pease caused it or was in the bedroom when it occurred. Moreover, the evidence proved that the distance from the door of the bedroom to the kitchen table was only six feet. Each of Pease's statements places her between the bedroom door and the kitchen when she was shot. The Commonwealth's firearms expert testified that the muzzle of the firearm was "at or near contact" with her when it was fired. The expert's testimony is not inconsistent with Pease's statements that she did not fire the gun. This evidence is also consistent with Pease's defense that her husband shot her in this area at close range.

The Commonwealth makes much of the fact that Pease found the third bullet and suggests that the jury could find that she placed it there. The evidence is undisputed, however, that three bullets were discharged from the gun. Although the investigators searched the residence, they did not find it. Tellingly, one investigator testified, when asked whether he was looking for the bullet or the bullet hole, "[w]ell of course, we were looking for the bullet hole. You have got to find the hole before you can find the bullet."

The forensic evidence also does not negate the conclusion that the bullet landed in the windowsill. Indeed the forensic expert testified that if the gun was shot from the bedroom area door at someone in the hallway, the bullet could possibly go to the kitchen window area. Depending on trajectory, velocity, and the angle of the bullet, the bullet could have landed on the windowsill. The evidence also proved that the bullets had been reloaded and did not have the usual charge. Thus, a forensic expert testified that a bullet with an altered, reduced charge

which passed through a body could have struck the structure
without penetrating it and fallen to the windowsill.

Moreover, the evidence does not conclusively establish that the bullet found lodged in the ironing board was the bullet that penetrated Pease. The firearm expert testified that the bullet that went into the ironing board was on a downward trajectory. The evidence established that in order for this to be the bullet that went through Pease's abdomen Pease would have had to be against the wall when the shot was fired. Given the downward trajectory of the bullet, it could also have been the bullet that entered Pease's husband's lung. Therefore, it is consistent with the forensic evidence that the bullet retrieved from the windowsill was the bullet that wounded Pease. In view of the forensic evidence, the investigators' testimony that they thoroughly searched the house could reasonably establish that they obviously overlooked the bullet in the windowsill.

The Commonwealth also argues that the evidence is inconsistent with Pease's assertion that she was not present when her husband was wounded. The Commonwealth points to a strand of Pease's hair found in the puddle of blood from her husband's mouth and to a foreign DNA substance found on Pease's shoe as evidence that Pease was present when her husband was shot. Although the evidence established that one blond hair that had been forcibly removed from Pease's head was in a puddle of blood near her husband's mouth, an expert in hair and natural fiber examination testified that it was possible the hair could have been removed in combing. Only one strand of hair was found. The expert testified it was unlikely that only one strand of hair could have been forceably pulled from a person's head by another person. The expert also testified that this hair could have been

transported from the husband's clothes.

A forensic expert in DNA testing testified that DNA material, consisting of blood and some other material, was found on Pease's left shoe. He explained that "the major profile [of the DNA found in the blood] was consistent with . . . Pease." There were also regions of DNA with genetic material inconsistent with Pease's DNA. The DNA material in these regions could have been indicative of a small amount of blood or saliva, sweat, or some other bodily fluid. Although the expert could not rule out Pease's husband as a possible contributor, the DNA was also found in one out of seven people of the Caucasian population in that region. More importantly, the expert could not identify when the DNA material was deposited. Therefore, neither piece of evidence establishes that Pease was present when her husband was wounded.

The Commonwealth argues that the jury could reject Pease's hypothesis that her husband shot her and then shot himself. It argues that her husband had told his co-worker that he believed Pease was having an extra-marital affair, that Pease was unsympathetic after her husband's death, and that Pease had a financial motive to kill her husband.

Although the record contains extensive testimony about forensics, the evidence fails to disprove the hypothesis that Pease's husband was the shooter. A large amount of testimony centered on where the shots were fired and whether the location of the bullets matched Pease's account of what had transpired. The assistant chief medical examiner testified that it was certainly possible for Pease's husband to inflict both wounds to himself. He testified that after the first lung shot, a person could live "at least a few minutes, probably several minutes . . . [a]nd in some cases, perhaps, . . . several hours." He testified that Pease's husband "would have had enough strength and presence of mind to do a great many things including" walking into the bedroom and pulling blinds and curtains off the wall. He also testified that Pease's husband had a .10 percent blood alcohol content which would have affected his judgment.

He further opined that it was also possible that Pease's husband could have walked from the bedroom to the living room, which is immediately adjacent to the kitchen area, and inflicted the second wound. Although he did not know whether it happened, he testified that it was possible for a person to walk twelve to fifteen feet after being shot without dropping any blood on the floor. According to the assistant chief medical examiner, it was just as reasonable as not to believe that Pease's husband walked down the hallway without depositing blood, pulled the blinds from the window, and shot himself in the heart.

The Commonwealth argues that because there was blood on Pease's husband's hands, he could not have handled the gun to fire the second shot to his heart which an expert explained would

have been immediately incapacitating.  A blood stain and spatter expert explained, however, that the shots to Pease's husband would not necessarily cause blood to spray from the wound.  The experts also testified that the blood on Pease's husband's hands could have come from coughing blood from his nose and mouth. Although there was evidence that Pease's husband could have been carrying, in one hand against his wound, the woman's underpants that was found by his body, no evidence  ruled out the reasonable possibility that Pease's husband had blood on the hand carrying the woman's underpants and no blood on the other hand carrying the gun.

The evidence revealed that no blood from the heart shot had flowed down toward Pease's husband's jeans but a small amount of the blood had flowed across his back as he lay on the floor. Contrary to the blood spatter expert's opinion that there was no indication Pease's husband had been upright when the shot to his heart was fired, the assistant chief medical examiner testified that Pease's husband could have been standing but the blood began flowing after he was on his side.  He also opined that Pease's husband could have been standing when the shot to his lungs was fired and that it was not necessary for him to have been against any surface for the bullet to have remained lodged in his back. In short, the evidence did not negate the hypothesis that Pease's husband fired the second shot.

Although the Commonwealth argues that the jury could infer that Pease had a motive to kill from the husband's belief that Pease was having an affair, no evidence in this record establishes the truth of the husband's supposition.  The

testimony by the co-worker of Pease's husband gives an indication, however, of the husband's beliefs and his state of mind.  Indeed, the testimony reveals that the husband was "not himself," appeared to the co-worker to be angry, and expressed the view that "something was going to happen real soon."  The evidence further proved the husband drank enough alcohol to affect his judgment after he left work that morning.  He also disabled Pease's car, as his friend suggested, and disabled the telephone in the home.  This evidence tends to prove that Pease's husband had a motive to initiate what transpired in the Pease home on November 18, 1993.

Investigator Parker testified that Pease was present when investigators interviewed the deputy chief medical examiner regarding the incident.  When the investigators asked the medical examiner whether Pease's husband had been in pain after the first shot, Pease said "a lot."  Another investigator testified that he was present when Pease viewed the pictures of her house and her deceased husband.  He said Pease laughed when she saw the pictures and another witness stated that Pease "was giggling and laughing and pointing at them and making notes on a paper." Although these were matters the jury could consider, they indicated only inappropriate reactions after the fact and are not inconsistent with the conclusion that her husband shot her.

The Commonwealth also notes that Pease's neighbor testified that while Pease was in his home waiting for the emergency response team, he overheard part of the conversation she was having with his wife.  He testified that Pease was telling his wife about "some problems she had been having."  After discussing

the need to have someone get her children, Pease then "leaned back in the chair" and said "I either done or did it all for [my children]." Although the Commonwealth argues that the jury could have concluded that Pease's statement was incriminating, Pease's neighbor's testimony clearly indicates that he heard only part of the conversation. The evidence fails to reveal the entire context in which Pease's statement was made. Pease's comment could reasonably relate to the discussion she was having with her neighbor's wife about her marital problems. Indeed, Pease later told the investigators she and her husband had argued for weeks about their children and her husband's failure to provide "enough money to run the household." Thus, this evidence is also not inconsistent with the hypothesis that her husband shot her. Where the facts are "equally susceptible of two interpretations, one of which is consistent with the innocence of the accused, the jury cannot arbitrarily adopt the interpretation which incriminates [the accused]." Massie v. Commonwealth, 140 Va. 557, 564, 125 S.E. 146, 148 (1924).

A witness from the Social Security Administration testified that as a result of Pease's husband's death Pease would receive $718 a month until her youngest daughter was age 16 and her two children would received $718 a month until they were age 18. No evidence proved, however, that Pease knew that she would receive this amount of social security benefits as a result of her husband's death. Without additional speculation, this evidence does not aid the Commonwealth's theory that Pease wanted to kill her husband to advance her personal financial gain.

Viewed in the light most favorable to the Commonwealth, the

evidence does not exclude the reasonable hypothesis that Pease's husband shot her and himself.  The forensic evidence does not exclude that reasonable hypothesis.  The close contact nature of the shots is consistent with that hypothesis.

> Proof by circumstantial evidence "is not sufficient . . . if it engenders only a suspicion or even a probability of guilt. Conviction cannot rest upon conjecture." Littlejohn v. Commonwealth, 24 Va. App. 401, 414, 482 S.E.2d 853, 859 (1997) (citing Hyde v. Commonwealth, 217 Va. 950, 955, 234 S.E.2d 74, 78 (1977)).  "'[A]ll necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.'"  Stover v. Commonwealth, 222 Va. 618, 623, 283 S.E.2d 194, 196 (1981) (quoting Inge v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567 (1976)).  "When, from the circumstantial evidence, 'it is just as likely, if not more likely,' that a 'reasonable hypothesis of innocence' explains the accused's conduct, the evidence cannot be said to rise to the level of proof beyond a reasonable doubt."  Littlejohn, 24 Va. App. at 414, 482 S.E.2d at 859 (quoting Haywood v. Commonwealth, 20 Va. App. 562, 567-68, 458 S.E.2d 606, 609 (1995)).  The Commonwealth need not "exclude every possible theory or surmise," but it must exclude those hypotheses "which flow from the evidence itself." Cantrell v. Commonwealth, 7 Va. App. 269, 289-90, 373 S.E.2d 328, 338-39 (1988) (citations omitted).  The evidence in the instant case fails to prove appellant's guilt beyond a reasonable doubt.

Betancourt, 26 Va. App. at 373-74, 494 S.E.2d at 878.

Accordingly, we reverse the convictions and dismiss the indictment.

Reversed and dismissed.

Bumgardner, J., dissenting.

I dissent from the decision that the evidence is insufficient to permit the verdict returned.

The victim was killed by two gunshots fired within an inch of his chest. The Commonwealth maintains his death was murder; the defendant asserts it was suicide. It was one or the other. The two opposite theories derive from the evidence at the scene and the statements of the defendant during the investigation. Twice a jury has accepted the interpretation of evidence argued by the Commonwealth.[2] I conclude that the jurors properly discharged their responsibility to assess credibility and that, after their determination of witness credibility, they drew reasonable inferences from the facts they found proved. Those proven facts, and the reasonable and justified inferences drawn from them, permit a verdict of guilt beyond a reasonable doubt to the exclusion of any theory of innocence. I would affirm the convictions.

Much of the evidence is undisputed though it developed during an extended trial and required much demonstration and amplification by photographs to delineate it. The victim was shot twice from a maximum distance of one inch; the defendant was shot once from the same distance. Investigators recovered a .357 caliber revolver from the living room that had fired the three shots. Two bullets were located during the initial investigation the night of the shooting. One remained in the victim's back

_____

[2] This Court did not grant an appeal on the issue of the sufficiency of the evidence on the first appeal.

barely penetrating the skin.  It passed through the victim's heart and caused almost immediate death.  A second bullet lodged in an ironing board in the laundry room behind the kitchen.  It penetrated the kitchen wall on a slightly downward trajectory forty-five inches above the floor and passed through a box of detergent before coming to rest.

The investigators could not find the third bullet though they searched the trailer for two days.  The defendant produced it a few days after the chief investigator informed her that he would not rule the death a suicide because he could not find the bullet.  The defendant called the investigator to her trailer and showed him a bullet lying in a kitchen window.  She said she had not disturbed the bullet once she discovered it.  Nothing damaged or marked the window glass, sill, or curtains in any manner.

Three shots were fired.  Whoever fired the shot through the victim's lung fired the shot through his heart.  A different bullet made each of the three wounds:  two to the victim, one to the defendant.  Accordingly, the possible explanations were mutually exclusive.  If the bullet in the ironing board passed through the victim's lung, then the bullet in the windowsill hit the defendant.  If the ironing-board-bullet passed through the defendant, then the windowsill-bullet penetrated the victim's lung.  The path of the bullet into the ironing board was exactly opposite to the path of a bullet landing in the windowsill:  the former going from right to left when facing the trailer and the latter going from left to right.  The location of the bullet in the windowsill was approximately in the same plane formed by the wall between the kitchen and the laundry room.  If the  ironing-

board-bullet struck the defendant, the victim did not fire a shot from the bedroom door, down the hall, and into the defendant as she claimed.

The ironing-board-bullet or the windowsill-bullet could have hit the victim or the defendant.  Once either bullet was linked to one of the two persons shot, the remaining bullet was linked to the other person shot.  Whomever the ironing-board-bullet struck defines whom the windowsill-bullet struck.  The victim committed suicide if the ironing-board-bullet hit him or if the windowsill-bullet hit the defendant.  Conversely, the defendant committed murder if the ironing-board-bullet hit her or if the windowsill-bullet hit the victim.  If evidence establishes the truth or falsity of any one of the four combinations, the other three possibilities are resolved.

The jury verdict resolved the issue of whether a bullet passed from the bedroom door, through the defendant, and landed in the windowsill.  The decision to disbelieve the defendant's story was not arbitrary or capricious.  Four witnesses stated unequivocally that the sill contained no bullet the night of the shootings.  The bullet suspiciously appeared after the investigator told the defendant he would not rule the death a suicide without it.  Other evidence also made the defendant's story unlikely.  The bullet traveled a maximum distance of six to eight feet and landed at nearly right angles to the general axis of flight.  It landed in the corner of the windowsill closest to the point of discharge, but it was so spent it dropped onto the sill without breaking the window, marking the sill, or tearing the curtains that covered the window.

In deciding to disbelieve the defendant's claim to have found the bullet, the jury was entitled to evaluate her other statements and conduct. From her first statement to her neighbor, she gave stories incompatible with undisputed physical facts. For example, she claimed she had never touched the gun, but she had a large gunshot burn on the side of her hand, and she tried to wash it off. She maintained she was six to eight feet from the gun when shot, but the residue on her sweatshirt showed the gun was within one inch of her. She claimed she left the trailer before the victim was shot, but she made remarks that indicated otherwise. The jurors heard that evidence and much more which taken together entitled them to disbelieve the defendant. The jury was entitled to evaluate the reasonableness of the defendant's story and find that she planted the bullet in the windowsill.

The validity of the guilty verdict does not just rest on the jurors' determination that the defendant lied and fabricated evidence. The physical evidence leads to that conclusion. The ironing-board-bullet struck the wall forty-five inches from the floor, the exact height of the entrance wound on the defendant. The victim dripped blood from the bedroom, to the kitchen, to the living room. The trail inexorably records his path into the living room where the fatal shot penetrated his heart.

The jurors could assess the physical facts and decide whether it was reasonable to infer that the victim first shot himself in the lung, walked to the bedroom without bleeding, walked back to the living room as he dripped blood, and shot himself again. The jury saw the demonstration of the way the

victim had to hold the gun to inflict the first wound.  The victim was right-handed.  The shot entered near the nipple passing from right of center up and outward.

The jury could also assess whether it was reasonable to believe the victim could walk dripping the trail of blood shown in the exhibits while never getting blood on his right hand.  The gun had no blood or fingerprints on it, and the victim's right palm had no imprint from the pistol grip.  An investigator testified he expected to find blood on the victim's hand because of the way he had dripped blood.  The jury could assess whether that was reasonable in light of specific testimony the victim's palm contained blood distinctive from the type coughed out his mouth and nose as he lay dying.

The jurors also could assess whether it was reasonable to infer that the defendant was present when the victim was shot.  The defendant was able to get away from the trailer and was not afraid the victim pursued her.  The defendant made statements that indicated she knew he was dead.  She knew the victim was in pain from the lung shot.  She had hidden the murder weapon in the bedroom so the victim could not find it.  The victim had another loaded pistol in his truck.  A blood-splatter expert found no indication that a smear of blood on the victim's back could have been made by him.  One strand of the defendant's hair was trapped in the blood coughed up by the victim as he lay on the floor dying.  She was able to find the third bullet.

The majority opinion accepts a review standard that the defendant urged in her brief:  if an item of evidence is susceptible of two interpretations, the jury cannot rely on it to

convict unless the Commonwealth shows the defendant's interpretation is impossible. The majority views each item of evidence in isolation, accepts the defendant's interpretation, and eliminates that item as evidence of guilt. It concludes with the maxim that the circumstantial evidence does not exclude every hypothesis of innocence.

For example, the majority dismisses the inference that the way in which the defendant held the gun caused the powder burn on her hand. The defendant argued shooting herself could not have made the particular shape of her burn. Both sides punctuated their testimony with demonstrations in support of their interpretations of this item of evidence. The record on appeal cannot provide such integral definition to the spoken word. The jury had those demonstrations in mind when assessing whether the defendant's interpretation was reasonable under all the related facts and circumstances.

I believe the majority's review of the facts is that rejected in Cantrell v. Commonwealth, 7 Va. App. 269, 373 S.E.2d 328 (1988). From the evidence presented, the jury must determine credibility and the weight of that which it finds as true. "'The weight which should be given to evidence and whether the testimony of a witness is credible are questions which the fact finder must decide.'" Id. at 289, 373 S.E.2d at 339 (quoting Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986)). Then the jury must decide which inferences to draw from the proven facts. "'[W]hat inferences are to be drawn from proved facts is within the province of the jury and not the court so long as the inferences are reasonable and justified.'" Id.

(quoting Higginbotham v. Commonwealth, 216 Va. 349, 353, 218 S.E.2d 534, 537 (1975)).  The jury is not required to accept the defendant's version of how a killing occurred.  Whether the defendant's explanation is a "'reasonable hypothesis of innocence' is a question of fact."  Id.

Much of the evidence in this case was undisputed.  The two sides offered opposing interpretations.  A jury resolves such conflict.  "When, as here, conflicting inferences flow from the undisputed evidence, principles of appellate procedure require us to adopt those conclusions most favorable to the Commonwealth if fairly deducible from the proven facts."  Pugh v. Commonwealth, 223 Va. 663, 667, 292 S.E.2d 339, 341 (1982).  Viewing the facts in the light most favorable to the Commonwealth, granting all reasonable inferences consistent with guilt, no reasonable theories of innocence remain.  Accordingly, I would affirm.